**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PRIVADO MARKETING GROUP LLC, DC 115
CEDAR NR, LLC and DON COQUI HOLDING
COMPANY, LLC

                          Plaintiffs,

        - against –

ELEFTHERIA REST CORP.,

                 Defendant.

No. 13-cv-3137 (ER-LMS)

ELEFTHERIA REST CORP. and JOHN
MANGAN,

         Counterclaim Plaintiffs,

        - against –

PRIVADO MARKETING GROUP LLC, DC 115
CEDAR NR, LLC and DON COQUI HOLDING
COMPANY, LLC,

         Counterclaim Defendants.

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

Dated:  July 28, 2016
       New York, New York

Respectfully submitted,
**MEDENICA LAW PLLC**
Olivera Medenica
OMedenica@Medenicalaw.com
3 Columbus Circle, 15th Floor
New York, NY 10019
Phone: (212) 785-0070
Fax: (646) 514-5302
*Attorneys for Plaintiffs*

**Table of Contents**

PRELIMINARY STATEMENT………………………………………………………………1

STATEMENT OF UNDISPUTED FACTS………………………………………………...2

ARGUMENT…………………………………………………………………………………7

I.      Legal Standard on Summary Judgment……………………………………………7

II.     Defendants Infringed and Continue to Infringe Upon Plaintiffs' Valid Trademark…….8

   A.   The Don Coqui Mark is a Valid Trademark Owned by Plaintiff Privado………………9

          1.   Defendants Have Failed to Rebut Plaintiff's Presumption of Ownership in the
               Don Coqui Mark……………………………………………………………..9

                  i)     Defendants Cannot Demonstrate Prior Continuous Use of the Don
                         Coqui Mark Because it is Undisputed that the Entity Upon Which
                         Defendants Purport to Base Such Use Was Defunct by April of
                         2009……………………………………………………………..10

                  ii)    Even if Such Entity's Alleged Prior Use Could Be Imputed to
                         Defendants, There is Not One Iota of Evidence That It Ever
                         Operated a New Rochelle Don Coqui Location…………………12

          2.   The Undisputed Evidence Clearly Reflects that Jaime Rodriguez Exercised
               Complete Control over DC Holding/DCNR's use of the Don Coqui Mark…13

                  i)     Oral and Implied Licenses under the Lanham Act Require
                         Evidence of Control…………………………………………...14

                  ii)    Jaime Rodriguez Exercised Control When the New Rochelle
                         Location Opened………………………………………………15

                  iii)   Marketing Materials Reflect Jaime Rodriguez's Controlling
                         Presence at the New Rochelle Location…………………………18

   B.   Defendants' Continued Use of Plaintiff's Don Coqui Mark Was Unauthorized and Is
        Likely to Cause Consumer Confusion…………………………………………...18

          1.   New York Law Provides that a Licensee's Continued Use of a Licensor's
               Trademark After Termination of the License Satisfies the Likelihood of
               Confusion Test………………………………………………………………19

2.   Undisputed Evidence Clearly Reflects That the Astoria Location Was Opened Pursuant to an Oral or Implied License Agreement………………………..19

III.   Jaime Rodriguez Did Not Commit Fraud Upon the USPTO…………………………..23

CONCLUSION…………………………………………………………………………………24

**Table of Authorities**

C<small>ASES</small>

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202
(1986)………………………………………………………………………………7

Cartier, Inc. v. Three Sheaves Co., Inc., 465 F. Supp. 123, 127-28 (S.D.N.Y. 1979)………….10

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)………..7

Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,
794 F.2d 38, 44 (2d Cir. 1986)……………………………………………………………19

D & N Boening v Kirsch Beverages,
63 NY2d 449, 472 N.E.2d 992, 483 N.Y.S.2d 164 (1984)…………………………………...14

Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002)………………………………………….8

Davis & Davis v S & T World Products,
217 AD2d 645, 629 N.Y.S.2d 487 (2d Dept 1995)…………………………………………...14

Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,
841 F. Supp. 1339, 1353-54 (E.D.N.Y. 1994)……………………………………………...10

Diarama Trading Co., Inc., 2005 U.S. Dist. LEXIS 19496 (S.D.N.Y. 2005)…………………....14

Feel Better Kids, Inc. v. Kids in Need USA, Inc.,
2012 U.S. Dist. LEXIS 139770 (E.D.N.Y. 2012)…………………………………………….19

Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001)…………………………………...7

Fusco Grp., Inc. v. Loss Consultants Int'l, Inc.,
462 F. Supp. 2d 321, 327 (N.D.N.Y. 2006)………………………………………………...10

Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)……………………...7

Juicy Couture v. Bella Intern. Ltd., 930 F. Supp. 2d, 489, 498 (S.D.N.Y. 2013)…………………9

La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,
495 F.2d 1265, 1270 n.5 (2d Cir. 1974)…………………………………………………….10

Meyers v Waverly Fabrics, Division of F. Schumacher & Company,
65 NY2d 75, 479 N.E.2d 236, 489 N.Y.S.2d 891 (1985)…………………………………...14

Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 377 n. 5 (2d Cir. 2000)………….15

Nat'l Westminster Bank USA v. Ross, 676 F.Supp. 48, 51 (S.D.N.Y. 1987)……………………8

Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 270-71 (2d Cir. 2011)…………………………23

Richemont North America, Inc. v. Huang, No.
2013 U.S. Dist. LEXIS 136790, 2013 WL 5345814, at *5 n.15 (S.D.N.Y. Sept. 24, 2013)……...8

Russo v. Banc of Am. Sec., LLC, 2007 U.S. Dist. LEXIS 47903 (S.D.N.Y. 2007)……………15

Ryan v. Volpone Stamp Co., Inc., 107 F. Supp. 2d 369, 381 (S.D.N.Y. 2000)…………………19

Sussman-Automatic Corp. v. Spa World Corp., 15 F. Supp. 3d 258 (E.D.N.Y.  2014)…………..8

Time, Inc. v. Petersen Publ'g Co. LLC, 173 F.3d 113, 117 (2d Cir.1999)………………………10

TMS Entertainment LTD v. Madison Green Entertainment Sales, Inc.,
2005 U.S. Dist. LEXIS 3072, No. 03 Civ. 517 (S.D.N.Y. Feb. 28, 2005)………………………15

Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987)…………………………7

## STATUTES

15 U.S.C. §1055………………………………………………………………………………...13

15 U.S.C. §1114(1)(a)………………………………………………………………………….8

15 U.S.C. 1115(a)……………………………………………………………………………….9

15 U.S.C. § 1125(a)…………………………………………………………………………….8

15 USC 1127…………………………………………………………………………………...14

Local Civil Rule 56.1(d)………………………………………………………………………..7

Fed. R. Civ. P. 56(c)…………………………………………………………………………....7

Fed. R. Civ. P. 56(e)…………………………………………………………………………....7

## OTHER

6J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 31:61 (4th ed.
2008)…………………………………………………………………………………………..23

## PRELIMINARY STATEMENT

Plaintiffs Privado Marketing Group LLC ("Privado"), DC 115 Cedar NR, LLC ("DCNR"), and Don Coqui Holding Company, Inc. ("DC Holdings"), brought this trademark infringement action against Defendants to prevent Defendants from capitalizing on the Don Coqui brand name, the success of which can only be attributed to the industriousness of a family business headed by its patriarch, Jaime Rodriguez.

While Jaime Rodriguez got his start in the food industry 30 years ago selling fish from a street cart, he has grown into a renowned restauranteur opening and operating a string of successful restaurants in Manhattan and the outer boroughs, including Jimmy's Bronx Café, Jimmy's Uptown, Jimmy's Downtown and Sofrito.  In establishing each of the Don Coqui line of restaurants, Jaime Rodriguez, and his two daughters Jaleene and Jewelle Rodriguez, have drawn upon their Puerto Rican heritage and Jaime Rodriguez's birthplace to deliver authentic food representative of the region's culture and lifestyle.

What this Court is asked to determine is whether the Rodriguez family's Don Coqui brand name actually belong to Defendants: a scorned former marketing director who held a minority membership interest in Plaintiff DC Holdings, and a Greek restaurant owner with deep roots in the Astoria community.

There are no disputed issues of fact in this case.  In their pleadings and submissions before this Court, Defendants have unabashedly portrayed themselves as the individuals, or entities, who created the Don Coqui brand name – to the exclusion of Plaintiffs.  During discovery, however, another more accurate story emerges.  Defendants plainly admit that they had to obtain Jaime Rodriguez's permission to use the Don Coqui mark at their Astoria restaurant; the grant of which also perversely forms the *sine qua non* of Defendants' allegations in this proceeding.

As will be discussed in the Argument section below, nothing on the undisputed record shows that Defendants could have in any way gained rights to the Don Coqui brand.  On the contrary, the undisputed record clearly shows that the Don Coqui brand was a carefully guarded brand by entities owned and operated by the Rodriguez family, and that Defendants' use of such a brand was made pursuant to an oral or implied license by such entities.  A license that was breached when Defendants chose to improperly continue benefitting from a brand that is not theirs.

## STATEMENT OF UNDISPUTED FACTS

Jaime "Jimmy" Rodriguez is an experienced restauranteur who has owned and operated a string of restaurants in Manhattan and the outer boroughs, including Jimmy's Bronx Café, Jimmy's Uptown, Jimmy's Downtown and Sofrito.  Declaration of Jaime "Jimmy" Rodriguez dated July 27, 2016 ("Jimmy Declr."), at ¶2.  Jaleene and Jewelle Rodriguez are the daughters of Jaime Rodriguez.  Plaintiffs' Rule 56 Statement of Material Facts ("PR56"), at ¶10.  Jaleene Rodriguez and Jewelle Rodriguez represent the interests of Jaime Rodriguez in the entities at issue in this proceeding where they own equity interests.  PR56, at ¶10.  Defendants understood Jaleene Rodriguez and Jewelle Rodriguez as representing the interests of Jaime Rodriguez.  PR56, at ¶11.

In March of 2008, John Mangan, Jewelle Rodriguez and Dimitrios Mitsios formed a New Jersey Limited Liability Company named Sofrito Xanadu LLC.  PR56, ¶12.  Jaime Rodriguez was personally involved in the business and operations of Sofrito Xanadu LLC; Jewelle Rodriguez appeared on all the official documents on her father's behalf.  PR56, ¶13.  Sofrito Xanadu LLC was formed for the purpose of operating a restaurant called "Sofrito."  PR56, ¶14.

In March of 2008, when Sofrito Xanadu LLC was formed, Jaime Rodriguez owned and operated a restaurant called "Sofrito" in Manhattan.  PR56, ¶15.  Jaime Rodriguez was interested

in expanding "Sofrito" to another location, which resulted in the formation of Sofrito Xanadu LLC.
Id.

Around March of 2008, the parties were contemplating opening a "Sofrito" restaurant in
the Meadowlands Xanadu, a shopping complex yet to be built at the Meadowlands, New Jersey.
PR56, ¶16.  Around March 18, 2008, Jewelle Rodriguez, on behalf of Sofrito Xanadu, and her
father, executed a commercial lease to open a "Sofrito" restaurant at the Meadowlands Xanadu
("Xanadu Lease").  PR56, ¶17.  Jaime Rodriguez was one of the guarantors on the commercial
lease.  Id.

Subsequent to the execution of the Xanadu Lease, Jamie Rodriguez was bought out of the
Manhattan "Sofrito," and as a result, he could no longer use the mark "Sofrito" for a restaurant.
PR56, ¶18.  In September of 2008, Jaime Rodriguez and John Mangan, as guarantors under the
Xanadu Lease, executed a First Amendment of Lease agreement stating that the trade name of
"Sofrito" would be replaced by "Don Coqui."  PR56, ¶19.  The Meadowlands Xanadu building
project never came to fruition, and as a result, the Xanadu Lease fell through.  PR56, ¶20.

On May 9, 2008, Jamie Rodriguez filed an "Intent-to-Use" trademark application with the
United States Patent and Trademark Office for the DON COQUI mark in his own name
(Registration No. 3,764,084) (the "DON COQUI Mark").  PR56, ¶21.  John Mangan was aware
of the DON COQUI Mark application filed by Jaime Rodriguez at the United States Patent and
Trademark Office and did not have any objections to it.  PR56, ¶22.  To date, none of the
Defendants have objected to the application or registration of the DON COQUI Mark, for the
exception of the present proceeding.  Id.

After the Xanadu Lease fell through, Jaime Rodriguez approached Brian MacMenamin of
MacMenamin's Grill in New Rochelle, New York, about taking over the McMenamin's Grill to

3

open a "Don Coqui" restaurant in New Rochelle, New York.   PR56, ¶23.   At the time, the MacMenamin's Grill was in bankruptcy proceedings.  PR56, ¶24.  "Don Coqui" in New Rochelle, which took over McMenamin's Grill, opened its doors around February of 2009.  PR56, ¶26. Jaime Rodriguez was personally involved in the transformation of the McMenamin's Grill into the first Don Coqui restaurant in New Rochelle.  PR56, ¶25.  John Mangan worked on marketing and promotional materials.  PR56, ¶27.  He registered the domain name www.doncoqui.com and was the website's administrator.  Id.

When "Don Coqui" in New Rochelle initially opened its doors, the bankruptcy proceeding was still ongoing, it opened under MacMenamin's existing lease and existing liquor license, and Brian McMenamin remained on board as a partner.  PR56, ¶28.  At no point in time was Dimitrios Mitsios ever involved in any way with the Don Coqui New Rochelle restaurant.  PR56, ¶29. Shortly after its opening, in March of 2009, the bankruptcy trustee shut down the Don Coqui New Rochelle restaurant.  PR56, ¶30.

On April 8, 2009, DC Holdings and DCNR were formed as New York limited liability companies.   PR56, ¶31.   The purpose of DC Holdings and DCNR was to own and operate the New Rochelle location of "Don Coqui."  PR56, ¶32.  Around June 18, 2009, MacMenamin's sold its assets to "DC 115 Cedar NR LLC d/b/a DON COQUI" (i.e. DCNR).  PR56, ¶33.  John Mangan knew that DC Holdings and DCNR were created to own and operate the New Rochelle location, and had no objections to it.   PR56, ¶34.

Around July of 2009, "Don Coqui" re-opened its doors at the same New Rochelle location. PR56, ¶35.  By July of 2009, Sofrito Xanadu LLC was a defunct entity that did not operate any businesses.  PR56, ¶36.  When "Don Coqui" re-opened its doors, the equity owners of DC

Holdings were Larry Siegal, Joseph Calascibetta, Jaleene Rodriguez, Jewelle Rodriguez and John Mangan.  PR56, ¶37.

Jaime Rodriguez executed the DC Holdings operating agreement, dated April 4, 2009, as a non-equity party.  PR56, ¶38.  John Mangan executed the operating agreement as a 10% owner. PR56, ¶39.  Pursuant to the DC Holdings operating agreement, Jaime Rodriguez was appointed by Jaleene Rodriguez, Jewelle Rodriguez and John Mangan, on the company's management committee, along with Larry Siegal and Joseph Calascibetta.  PR56, ¶40.  The DC Holdings operating agreement refers to the DON COQUI Mark as a registered trademark.  PR56, ¶41.

On December 23, 2009, Jaime Rodriguez filed a statement of use in connection with the DON COQUI trademark application, alleging that the date of first use of the mark was July 3, 2009.  PR56, ¶42.  The DON COQUI trademark registration was issued by the USPTO on March 23, 2010.  PR56, ¶43.

On April 16, 2010, Jewelle Rodriguez and Jaleene Rodriguez executed the operating agreement for Privado Marketing Group LLC, each owning a 50% membership interest in Privado. PR56, ¶44.  On April 6, 2011, Jaime Rodriguez assigned the entire interest and goodwill in the DON COQUI Mark to Privado Marketing Group LLC and recorded the assignment by the USPTO. PR56, ¶45.

Around April 30, 2011 Joseph Callascibetta and Laurence Siegel entered into an agreement to sell their membership interest in DC Holdings to Jaleene Rodriguez and Jewelle Rodriguez. PR56, ¶46.  John Mangan assented to such transfer and executed the agreement as well.  Id. Around July 26, 2011 John Mangan entered into an agreement with Jaleene Rodriguez and Jewelle Rodriguez to sell his 10% membership interest in DC Holdings to Jaleene and Jewelle Rodriguez.

PR56, ¶47.  As a result of these transfers, Jaleene and Jewelle Rodriguez each became a 50%

owner in DC Holdings.  Id.

In mid to late 2011, the parties revisited Plaintiffs' involvement with Dimitrios Mitsios and

the possibility of opening a DON COQUI in Astoria.    PR56, ¶48.  Dimitrios Mitsios was and is

a principal of Defendant Eleftheria Rest. Corp. ("Eleftheria").   PR56, ¶7.   Eleftheria is a

corporation organized and existing under the laws of the State of New York with a principal place

of business at 2818 31st Street, Queens, New York (the "Astoria location").  PR56, ¶5.

There has never been a written license agreement relating to the use of the DON COQUI

Mark at the Astoria location.  PR56, ¶49.  In order to be able to use the DON COQUI Mark at the

Astoria location, Dimitrios Mitsios, on behalf of Defendants, requested Jaime Rodriguez's

permission to use the DON COQUI Mark in the Astoria location.  PR56, ¶50.  Dimitrios Mitsios

also requested that Jaime Rodriguez be personally involved in the opening and operations of the

Astoria location.  PR56, ¶51.

Around October of 2011, the DON COQUI Astoria location opened.   PR56, ¶52.  Jaleene

and Jewelle Rodriguez were both personally involved in the operations of the DON COQUI

Astoria location.  PR56, ¶53.  Defendant Eleftheria made regular payments to Privado (i.e. the

entity that owns the DON COQUI trademark).  PR56, ¶54.  Both Jaleene Rodriguez and Jaime

Rodriguez were on Eleftheria's payroll.  PR56, ¶55.

Around February 5, 2013, Plaintiffs sent Defendant a cease and desist letter requesting that

Defendants cease using the DON COQUI Mark; Defendants received this letter.     PR56, ¶56.

Defendant Eleftheria refused to discontinue its use of the DON COQUI Mark.  PR56, ¶57.

Defendant Eleftheria has used and continues to use the DON COQUI Mark since the restaurant's

opening.  PR56, ¶58.  After communicating by telephone and email with representatives and

counsel for Defendant, Plaintiffs sent a follow up demand letter to Defendant, renewing Plaintiffs' cease and desist demand, around March 22, 2013.  PR56, ¶59.

To date, Defendant Eleftheria has not complied with or indicated a willingness to comply with Plaintiffs' demands.  PR56, ¶60.  Plaintiffs have on a number of occasions, via telephone and email attempted to obtain Defendant's amicable agreement to cease using the DON COQUI Mark. PR56, ¶61.  Despite such attempts, Defendant has refused to cease using the DON COQUI Mark. PR56, ¶62.

## ARGUMENT

### I.    LEGAL STANDARD ON SUMMARY JUDGMENT

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party.  Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion."); Nat'l

Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.").

Nor can the nonmoving party rest only on the pleadings. Celotex, 477 U.S. at 324 (Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings"); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). Instead, each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II. DEFENDANTS INFRINGED AND CONTINUE TO INFRINGE UPON PLAINTIFF'S VALID TRADEMARK

Courts employ substantially similar standards when analyzing claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); trademark infringement under New York common law; and unfair competition under New York common law. See Richemont North America, Inc. v. Huang, No. 2013 U.S. Dist. LEXIS 136790, 2013 WL 5345814, at *5 n.15 (S.D.N.Y. Sept. 24, 2013) ("Count III is for unfair competition under Section 43(a) of the Lanham Act, and requires an identical test to that for infringement."); see also Sussman-Automatic Corp. v. Spa World Corp., 15 F. Supp. 3d 258 (E.D.N.Y. 2014).

In this regard, "[t]o prevail on an infringement action [under the Lanham Act, 15 U.S.C. § 1114(1)(a)], a plaintiff must demonstrate: (1) 'that it has a valid mark entitled to protection,' and (2) 'that the defendant's use of that mark is likely to cause confusion.'" <u>Juicy Couture v. Bella Intern. Ltd.</u>, 930 F. Supp. 2d, 489, 498 (S.D.N.Y. 2013) (quoting <u>Time, Inc. v. Petersen Publ'g Co. LLC</u>, 173 F.3d 113, 117 (2d Cir.1999))

### A.   The Don Coqui Mark is a Valid Trademark Owned by Plaintiff Privado

Defendants have thus far argued that Plaintiff Privado does not have a valid trademark because the registration was fraudulently obtained.  <u>See</u> Declaration of Olivera Medenica dated July 28, 2016 ("OM Declr."), Ex. G, at 17-18. According to Defendants, the initial applicant in the mark, Jaime Rodriguez, purportedly misrepresented the date of first use of the mark, because it is really Defendants who were the first users of the mark.  <u>Id.</u>  As discussed below, not only is it factually impossible for Defendants to have made prior continuous use of the mark, but Defendants' argument is belied by their own testimony on the record.

> 1.   Defendants Have Failed to Rebut Plaintiff's Presumption of Ownership in the Don Coqui Mark

It is undisputed that: (1) on May 9, 2008, Jaime Rodriguez filed an "Intent to Use" trademark application with the USPTO for the DON COQUI Mark in his own name (PR56 ¶21), (2) on December 23, 2009, he filed a statement of use in connection with the mark's application, alleging that the date of first use of the mark was July 3, 2009 (PR56 ¶42), (3) that registration on the mark was issued by the USPTO on March 23, 2010 ((PR56 ¶43), and that (4) on April 6, 2011, Jaime Rodriguez assigned the entire interest and goodwill in the Don Coqui Mark to Privado Marketing Group LLC and recorded the assignment with the USPTO (PR56 ¶45).

A trademark registration "is prima facie evidence of the mark's validity, and of the registrant's ownership and exclusive right to use the mark in commerce in the United States."  15

U.S.C. 1115(a); <u>Fusco Grp., Inc. v. Loss Consultants Int'l, Inc.</u>, 462 F. Supp. 2d 321, 327 (N.D.N.Y. 2006).   A party does not acquire ownership of a trademark through registration, however.  <u>Fusco</u>, 462 F. Supp. 2d at 327; <u>Cartier, Inc. v. Three Sheaves Co., Inc.</u>, 465 F. Supp. 123, 127-28 (S.D.N.Y. 1979) ("The purpose of the registration scheme is not to create rights, but to allocate the burden in the trial of an action for infringement.") "Ownership of a trademark stems from prior appropriation and use.  Where claimants dispute the right to use a particular trademark, the general rule is that priority of appropriation and use determines which litigant will prevail in its use."' <u>Fusco</u>, 462 F.Supp.2d at 327; <u>see also</u> <u>Time, Inc. v. Petersen Publ'g Co.</u>, 173 F.3d 113, 118 (2d Cir. 1999); <u>La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.</u>, 495 F.2d 1265, 1270 n.5 (2d Cir. 1974).

In order to prevail on this defense, the claimed senior user must demonstrate (1) present rights in the mark, (2) acquired prior to the date of registration, (3) continual use of the mark since that date, and (4) use prior to the registrant on the goods or services that are in issue.  <u>Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.</u>, 841 F. Supp. 1339, 1353-54 (E.D.N.Y. 1994).

> i) *Defendants Cannot Demonstrate Prior Continuous Use of the Don Coqui Mark Because it is Undisputed that the Entity Upon Which Defendants Purport to Base Such Use Was Defunct by April of 2009*

In their pleadings, Defendants allege that "Mangan and/or Mitsios, and/or entities aligned with Mangan and/or Mitsios own the rights created by the use of the [DON COQUI] Mark at the New Rochelle location."  <u>See</u> OM Declr., Ex. E, at ¶30.  In submissions before this Court, Defendants argue that "a New Jersey LLC, called Sofrito Xanadu LLC. . . was the first user of the DON COQUI trademark" and that such first use "commenced in or prior to March of 2009."  <u>See</u> OM Declr., Ex. G, at 4-5.  Because Sofrito Xanadu LLC's members included John Mangan and

10

Dimitrios Mitsios, Defendants conclude that John Mangan and Eleftheria have senior rights to the DON COQUI Mark.  Id.

Defendants' arguments do not make sense for numerous reasons, not the least of which is that John Mangan himself concedes that by April of 2009, Sofrito Xanadu LLC was a defunct entity that did not operate any businesses.  PR56, ¶36.  During his deposition, Mangan testified that this New Jersey LLC operated the New Rochelle location and then "was taken down" by the trustee.  Id.; see also OM Declr., Ex. J, at 90.  According to Mangan, the New Jersey LLC did not operate any other businesses in New York, and this brief stint running the New Rochelle location was the extent of its operations.  Id.

As Mangan concedes in his submissions before the Court and during his testimony, Plaintiffs DC Holdings and DCNR were formed for the sole purpose of operating the New Rochelle Don Coqui location, and he agreed to the transfer of assets from this "New Jersey LLC" to Plaintiffs in order to do so.  PR56, ¶34.  In fact, Mangan executed DC Holding's operating agreement, dated April 4, 2009 which clearly states that the purpose of the entity is to own and operate, through the wholly owned subsidiary DCNR, a Latin themed restaurant under the name of "Don Coqui" at the New Rochelle location. PR56, ¶39; see also Declaration of Jaime "Jimmy" Rodriguez dated July 27, 2016 ("Jimmy Declr."), Ex. F, at 1-2.  So it is clear that by April 4, 2009, Sofrito Xanadu LLC had no relations to the DON COQUI Mark as the New Rochelle was the only location using the Mark at that time.

Furthermore, with respect to Dimitrios Mitsios, and his entity, Eleftheria, he had no relations to it either.  In his deposition, Mitsios clearly testified that he had absolutely nothing to do with the New Rochelle Don Coqui location.  PR56, ¶29; OM Declr. I, at 26-29, 71, 72-73, 80.

11

In fact, Mangan also testified that Mitsios was not involved with the New Rochelle location. PR56, ¶29; OM Declr., Ex. J, at 71

It is simply incomprehensible, given the above, how this "New Jersey LLC" could claim prior and continuous use if, assuming what Defendants are alleging is true, this entity ceased using the mark, with clearly no intent to resume, well before the July re-opening of the New Rochelle Don Coqui location.  It is even more perplexing how such prior use could be subsequently imputed to Defendants so that *Eleftheria's* use of the DON COQUI Mark in Astoria, *over two years* after the demise of the New Jersey LLC, could relate back to this alleged initial first use.

In light of the above, Defendants' argument that they are prior users of the Don Coqui Mark must necessarily fail.

> ii)  *Even if Such Entity's Alleged Prior Use Could Be Imputed to Defendants, There is Not One Iota of Evidence That It Ever Operated a New Rochelle Don Coqui Location*

Even assuming, *arguendo*, that Sofrito Xanadu LLC alleged prior use, even if brief, could somehow, incredibly, be imputed to Defendants, there is absolutely not a shred of evidence in the record that Sofrito Xanadu LLC was in fact affiliated with the New Rochelle Don Coqui location in the first place.  Indeed, the McMenamin's bankruptcy proceeding is a well-documented publicly accessible proceeding, and based upon our review, we were unable to find any mention of Sofrito Xanadu LLC, John Mangan or Dimitrios Mitsios anywhere in the record.

In stark contrast, Jaime Rodriguez's name is prominently featured throughout the proceedings.  Indeed, there are numerous references to Jaime Rodriguez as a "new investor" into the MacMenamin's Grill who was interested in making a "cash infusion deal" into the bankrupt entity.  See OM Declr, Ex. W.  While there is a reference to a "Don Coqui" company, there is no reason to believe that this reference signifies Sofrito Xanadu LLC when the record also reflects

that DCNR had a d/b/a of "Don Coqui" and the reference could have been to a new entity to be formed by Jaime Rodriguez. <u>See</u> Declaration of Jaleene Rodriguez dated July 27, 2016 ("Jaleene Declr."), Ex. D, at P00266; <u>see also</u> OM Declr., Ex. W, at P001319-1321 (referencing a "new entity" and "Jimmy Rodriguez and his newly formed company "Don Coci")

Furthermore, it is clear based upon Mangan's deposition that no New Jersey LLC ever "took over" the operations of the McMenamin's Grill.  Indeed, Mangan testified that when "Don Coqui" initially opened its doors (before the trustee shut them down), the bankruptcy proceeding was still going on, it opened under MacMenamin's existing lease and existing liquor license, and Brian McMenamin remained on board "as a partner."  PR56, ¶28.  It is difficult to comprehend what role, if any, this New Jersey LLC had in the bankruptcy proceeding and this initial, and short-lived, run as "Don Coqui" since it is eminently clear that the restaurant was shut down by the bankruptcy trustee by March 20, 2009.  <u>See</u> Jimmy Declr., Ex. E, at ¶4 (bankruptcy trustee declaration stating that "I closed down the restaurant operation early in the morning of March 20, 2009 due to shortages in operating funds").

In light of the above, taking Mangan's allegations in the best light possible, Mangan had, at most, a peripheral and supporting role to Jimmy Rodriguez's well documented involvement in attempting to turn around the fledgling MacMenamin's Grill into a profitable "Don Coqui."

Accordingly, for those reasons alone, Defendants' arguments that they are prior users of the Don Coqui Mark must also necessarily fail.

     2.    <u>The Undisputed Evidence Clearly Reflects that Jaime Rodriguez Exercised Complete Control over DC Holding/DCNR's use of the Don Coqui Mark</u>

Defendants are expected to argue that even if DC Holdings and DCNR are able to establish first use of the DON COQUI mark, Jaime Rodriguez was the owner of the mark at the time, and

there was no valid license agreement between the parties at the time – hence, it was abandoned. For the reasons further stated below, such an argument overlooks the extent to which Jaime Rodriguez fundamentally controlled every aspect of these entities, and as a result, such trademark use was in fact either an oral or implied licensing arrangement.

i)   _Oral and Implied Licenses under the Lanham Act Require Evidence of Control_

The Lanham Act legitimized licensing by acknowledging that a mark can validly be used by related parties.  Section 5 allows the authorized and controlled use of a mark by a related company to inure to the benefit of a trademark owner, provided the mark is not used to deceive the public.  See 15 USC 1055.  This provision reflects the basic rationale underlying trademark law: protecting consumers and fair competition.  Section 45 defines "related company" as any person whose use of a mark is _controlled_ by the owner of the mark.  See 15 USC 1127.

Trademark licenses can be either express or implied.  Oral licenses have been recognized in New York and are subject to the same requirements for pleading contract formation.  See D & N Boening v Kirsch Beverages, 63 NY2d 449, 472 N.E.2d 992, 483 N.Y.S.2d 164 (1984); Meyers v Waverly Fabrics, Division of F. Schumacher & Company, 65 NY2d 75, 479 N.E.2d 236, 489 N.Y.S.2d 891 (1985); Davis & Davis v S & T World Products, 217 AD2d 645, 629 N.Y.S.2d 487 (2d Dept 1995).  As in written license agreements, there must be an element of _control_ between the licensor and licensee in any oral licensing arrangement.  2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:59 (4th ed. [2015]).

"A contract implied in fact may result as an inference from the facts and circumstances of the case although not formally stated in words . . . and is derived from the 'presumed' intention of the parties as indicated by their conduct."  Diarama Trading Co., Inc., 2005 U.S. Dist. LEXIS

19496 (S.D.N.Y. 2005), at 34 (quoting TMS Entertainment LTD v. Madison Green Entertainment Sales, Inc., 2005 U.S. Dist. LEXIS 3072, No. 03 Civ. 517 (S.D.N.Y. Feb. 28, 2005)).  An implied-in-fact contract is equally binding as an express contract; therefore, an implied in fact contract requires proof of the same elements to establish an express contract - mutuality of intent, offer and acceptance, lack of ambiguity, and consideration. Russo v. Banc of Am. Sec., LLC, 2007 U.S. Dist. LEXIS 47903 (S.D.N.Y. 2007), at 12.  However, these elements can be inferred from the "specific conduct of the parties, industry custom, and course of dealing." Diarama Trading Co., Inc., 2005 U.S. Dist. LEXIS 19496, at 34 (quoting Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 377 n. 5 (2d Cir. 2000)). The court in Diarama Trading Co., Inc., for instance, found that an implied-in-fact contract existed between the defendants and a third party with superior trademark rights to the mark at issue therein because the third party (1) had issued news articles and press releases, and had given company presentations, outlining how the defendants would receive additional resources and services, including use of the disputed mark in their advertising, (2) asked the defendants to return old marketing materials in exchange for new materials comprising the disputed mark, and (3) provided guidelines to defendants on how to market the disputed trademark. Id. at 34-36.

    ii)       *Jaime Rodriguez Exercised Control When the New Rochelle Location Opened*

In the present case, the evidence overwhelmingly reflects that the parties understood that the restaurant was "Jimmy's" and that he was integral to the success of the New Rochelle location. The DC Holdings Operating Agreement, dated April 4, 2009, was specifically between the members of the LLC and Jaime Rodriguez.  PR56, ¶¶37-40; see also Jimmy Declr., Ex. F. Furthermore, the Operating Agreement specifically states that the company and its wholly owned

subsidiary, DCNR, will be "controlled by the Management Committee" which is defined as exclusively consisting of Jaime Rodriguez, along with Joseph Calascibetta and Larry Siegel.  See Jimmy Declr, Ex. F, ¶¶1, 3.

The Operating Agreement also specifically states that it will act as a "parent entity of one or more subsidiaries, which own(s) and/or operate(s) a Latin themed restaurant(s) under the name 'Don Coqui ®'".  See Jimmy Declr., Ex. F, at 2.  In Section 9 of the Operating Agreement, the parties recognizes the Don Coqui mark as a registered mark and acknowledge that such mark may have been "owned or developed by JIMMIE".  See Jimmy Declr., Ex. F, ¶9.  The same paragraph also discusses how DC Holdings may license the Mark to DCNR for the purpose of operating a restaurant.  Id.  Again, Defendant John Mangan assented to these terms by executing this agreement.  Id. at 15.

In other words, by April of 2009, the parties had full knowledge that there was a registered Don Coqui mark,[1] consented to Jaime Rodriguez controlling role in both DC Holdings and DCNR, and agreed that one, or more, of DC Holdings' subsidiaries would operate various restaurants using the registered Don Coqui Mark.

To make Jaime Rodriguez's daily involvement in DC Holdings' affairs clearer, the Operating Agreement further provides that Jaime Rodriguez was to commit to an exclusive employment agreement to ensure that he "devote all his time and effort to the business of [DC Holdings] and [DCNR]".  See Jimmy Declr., Ex. F, at ¶7.  If that were not enough, the Operating Agreement includes a covenant not to compete, so as to ensure that Jaime Rodriguez focused his full attention to DC Holdings and DCNR.  See Jimmy Declr., Ex. F, at ¶8.  Jaime Rodriguez's

---

[11] While the Don Coqui mark was not registered by that time, the parties had at the very least constructive notice that an application (a public document) was pending.

compensation was to be set by the Management Committee, in which he was a controlling participant.  See Jimmy Declr., Ex. F, at ¶7.

In other words, not only was Jimmy Rodriguez in control of the entity, but he was also contractually obligated to exercise this control and participate in the restaurant's obligations. While not explicitly stated, this is a recognition by the remaining members that "Jimmy" was the essential element DC Holdings' members were relying upon to ensure the restaurant became a success.  Without Jimmy, there would have been no investors, no New Rochelle location, and no one with the requisite hospitality and restaurant experience to take the helm of the Don Coqui enterprise.

While Dimitrios Mitsios admitted his lack of involvement in DC Holdings and DCNR, John Mangan's knowledge of these facts above is undisputed.  This is because: (1) he executed the DC Holdings operating agreement (PR56, ¶39), (2) acknowledged his signature during depositions (id., OM Declr, Ex. J, at 107) and (3) specifically appointed Jaime Rodriguez to speak on his behalf as a Management Committee member (Jimmy Declr., Ex. F, at ¶3).  In addition, even if, arguendo, the existence of Don Coqui Mark's USPTO public record was not sufficient constructive notice of the mark's existence, this agreement placed John Mangan with specific knowledge of the Don Coqui mark application and Jaime Rodriguez's ownership of the same[2]; a knowledge that John Mangan expressly conceded during his deposition.  See Jimmy Declr., Ex. F, at ¶1; OM Declr., Ex. J, at 110.  It is important to note that not once since April of 2009, when John Mangan indisputably gained knowledge of the mark's application, did he object to such application, and subsequent registration, for the exception of the present lawsuit.  See OM Declr.,

---

[2] John Mangan's level of education and sophistication is undisputed.  He graduated from law school, and accordingly, had the basic skill and knowledge to understand the agreements he was executing.  See OM Declr, Ex. J, at 9-10.

Ex. V (no objection in DON COQUI prosecution history).  On the contrary, he admitted during

his deposition that he had no objections to the Mark's registration and "didn't see anything wrong

with it."  See OM Declr., Ex. J, at 110.

> iii)    *Marketing Materials Reflect Jaime Rodriguez's Controlling Presence at*
> *the New Rochelle Location*

The fact that Jaime Rodriguez played such important, if not primary, role in DC Holdings

and DCNR, is reflected in the company's marketing materials at the time.  The restaurant's website

in July of 2009 prominently featured the following message:

> Jimmy Rodriguez is honored in inviting you to Don Coqui to experience the newest
> and most exciting Puerto Rican dining in New York, inspirited by four generations
> of 'family secret recipes' birthed in the enchanting island of Puerto Rico.

See OM Declr., Ex. Q.

Since John Mangan testified that he was in charge of everything relating to "marketing,"

one can only presume that he was fully aware of the copy prominently displayed on the

DonCoqui.com website, to which he testified he was also the exclusive administrator.  PR56 ¶27.

For Defendants to argue that Jaime Rodriguez did not control the Don Coqui Mark at DC

Holdings or DCNR, or that his role was peripheral to John Mangan's or Dimitrios Mitsios' is

grossly bellied by the undisputed evidence.  According, for all the reasons stated above Defendants

have failed to rebut Plaintiffs' presumption of ownership in the Don Coqui Mark.

**B.**    **Defendants' Continued Use of Plaintiff's Don Coqui Mark Was**
**Unauthorized and Is Likely to Cause Consumer Confusion**

As discussed above, Defendants have argued that they have senior rights to the Don Coqui

Mark because of prior use.  See OM Declr., Ex. G, at 17.  Defendants also argue that there never

was any "verbal license" between the parties.  See OM Declr., Ex. G, at 19.  As a corollary to this

18

argument, Defendants are expected to argue that Plaintiffs abandoned their mark by failing to enter into such a licensing arrangement.  For the reasons stated below, such arguments are misplaced.

>    1.    New York Law Provides that a Licensee's Continued Use of a Licensor's Trademark After Termination of the License Satisfies the Likelihood of Confusion Test

The Second Circuit has held the following regarding licensees, such as Defendants, who continue to use their licensor's trademark after their authorization to do so expires:

> A licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. When such party, as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public.

Church of Scientology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 44 (2d Cir. 1986).  Because of this increased probability of consumer confusion, courts find the likelihood of consumer confusion element satisfied simply by the fact that the infringer is a former licensee. See Ryan v. Volpone Stamp Co., Inc., 107 F. Supp. 2d 369, 381 (S.D.N.Y. 2000) (collecting cases); see also Feel Better Kids, Inc. v. Kids in Need USA, Inc., 2012 U.S. Dist. LEXIS 139770 (E.D.N.Y. 2012).

>    2.    Undisputed Evidence Clearly Reflects That the Astoria Location Was Opened Pursuant to an Oral or Implied License Agreement

Based on the above, it is clear that by October of 2011, when the Astoria location of "Don Coqui" opened, Defendants had to obtain the right to use the mark from Plaintiffs.  Defendants have thus far argued that no such license every existed.  While the undisputed record does reflect that there never was a written license agreement between Don Coqui and Defendants (PR56, ¶49),

the overwhelming evidence clearly demonstrates that there was either an oral or implied license between the parties to use the Don Coqui Mark.

For the sake of brevity, New York law governing oral or implied trademark license agreement has been discussed at length *supra* and will not be repeated here.

It is undisputed that Dimitrios Mitsios was fully aware that he needed to seek Jaime Rodriguez's permission to use the Don Coqui Mark, and that he did do so in order to have the right to use the mark at the Astoria Location.  PR56, ¶50.  It is further undisputed that both John Mangan and Dimitrios Mitsios were fully aware that Jaime Rodriguez's daughters represented the interests of Jaime Rodriguez in all of these transactions.   PR56, ¶10.   Relevant portions of Mitsios' deposition held on January 4, 2016 are included here:



See OM Declr., Ex. I, 33, 53-54.

20

In other words, as a 100% owner of Eleftheria - as Dimitrios Mitsios testified he is - he knew full well that the only way Eleftheria could open a Don Coqui in Astoria was by getting Jaime Rodriguez's permission to do so. Id.; PR56, ¶50. He also knew full well that Jaime Rodriguez spoke on behalf of his daughters, and that his daughters, Jaleene and Jewelle Rodriguez, represented their father's interest.[3] PR56, ¶10.

As part of the deal, the Rodriguez family, including Jaime, Jaleene and Jewelle Rodriguez were to control and oversee the Astoria Location's operations. PR56, ¶¶51, 53. Mitsios specifically testified that Jaime Rodriguez did "everything" in Astoria, and that was specifically part of the deal. See OM Declr., Ex. I, at 55. Mitsios further testified that Jaleene and Jewelle also provided services at the Astoria Location (id., at 50); Mangan testified that Jaleene was part of the "marketing" team at the Astoria Location, which he "ran." See OM Declr, Ex. J, at 136. Mangan further testified that Jewelle and/or Jaleene were also part of the "hiring" at the Astoria Location. Id., at 134-135.

It is undisputed that the Rodriguez family was also involved in the financial aspects of the Astoria Location. Both Mitsios and Mangan testified that Fernando Roque, known to Defendants as Plaintiffs' "controller" and Jaime Rodriguez's "bookkeeper", was regularly at Eleftheria's premises, on a weekly basis. See OM Declr., Ex. I, at 45; and Ex. J, at 91-92 (testifying that Fernando Roque was the "controller" for Plaintiffs).

Should there be any doubt as to the extent of the Rodriguez's involvement, the marketing materials of the Astoria Location, as reflected on the www.DonCoqui.com website, which Mangan

---

[3] Defendant Mangan testified that Jaime Rodriguez structured "all" of his deals that way in order to purportedly avoid paying taxes, and evade "child support" obligations. See OM Declr., Ex. J, at 34-35. Mitsios testified that "Jimmy"'s practice is to never have his name appear on any papers, and that instead he uses his daughters to replace his name on paper. See OM Declr, Ex. I, at 39-40. Whatever sordid motives Defendants choose to attach to Jaime Rodriguez's actions, the fact of the matter is that both John Mangan and Dimitrios Mitsios knew, and testified, that Jaime Rodriguez's daughters spoke on behalf of their father, and Jaime Rodriguez spoke on behalf of the entities to which his daughters owned an equity interest.

was in charge of as the exclusive administrator and head of "marketing" (PR56, ¶27; OM Declr,

Ex. J, at 136), reflect the Rodriguez family's full control of the Astoria location's operations.

Indeed, the "About Us" section of the Don Coqui Astoria Location website at

www.DonCoqui.com, circa October of 2011, described the restaurant as follows:

> Don Coqui is the most exciting Authentic Puerto Rican dining in all of the Tri-State area, *owned and operated by third generation restauranteurs Jaleene and Jewelle Rodriguez, daughters of renowned restauranteur Jimmy Rodriguez.*
>
> These two young entrepreneurial Latinas have spent their entire life in a family run business. . . Their grandfather Jimmy Rodriguez Sr. started selling fish in the south Bronx, their father Jimmy Rodriguez Jr. owned numerous restaurants in New York including Jimmy's Bronx Café.  These two ladies have inherited the passion for the business and are proud to carry on the family legacy with Don Coqui.
>
> Don Coqui is proud to present another shortcut to Puerto Rico in Astoria Queens. . . The lounge is symbolic of *the Rodriguez' signature style* of elegance and glamour . . . Don Coqui has everything you would need to make your experience a memorable one.

See OM Declr, Ex. R (emphasis added)

In considerations for all of the above, including the right to use the Don Coqui Mark,

Eleftheria made regular payments to Privado, and placed the Rodriguez family on payroll.  PR56,

¶¶54-55.  Indeed, Eleftheria's 2012 tax return reveal

(OM Declr., Ex. S); and

Eleftheria's payroll records show that a salary was paid to Jaime Rodriguez and Jaleene Rodriguez

for their services to Eleftheria (OM Declr., Ex. T).

Given the above, it is undisputed that Defendants did indeed open and operate their Astoria

Location pursuant to either an oral or implied license.  It is similarly undisputed that Defendants

received Plaintiffs' cease and desist letter, and despite such correspondence, refused to discontinue

the use of the Don Coqui Mark, and continue using it to date.  PR56, ¶¶56-62.

Accordingly, for all of these reasons, Plaintiffs have satisfied the likelihood of consumer confusion element because Defendants, as former licensees, continued using the Don Coqui Mark past the license's termination.

### III.   JAIME RODRIGUEZ DID NOT COMMIT FRAUD UPON THE USPTO

The Lanham Act provides for cancellation of a trademark registration at any time if it was fraudulently obtained.  15 U.S.C. 1064(3).  The party seeking cancellation on the basis of fraud must establish that the registrant misrepresented a material fact, that the registrant knew or should have known that its representation was false, that the registrant intended to induce the PTO to act in reliance thereon, that the PTO reasonably relied on the misrepresentation, and that damages proximately resulted from that reliance.  See Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 270-71 (2d Cir. 2011) (citing 6J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 31:61 (4th ed. 2008)).

Defendants' argument has been that Sofrito Xanadu LLC was the prior user of the Don Coqui Mark, and therefore, when Jaime Rodriguez filed his Statement of Use stating that the first use was July 3, 2009, he committed fraud upon the USPTO.  Defendants conclude the mark must therefore be cancelled, so that Defendants receive the windfall of continuing use of the Don Coqui Mark. See generally, OM Declr, Ex. G.

For all the reasons argued above, Defendants' argument is untenable.  As an initial matter, even if, arguendo, by some incredible stretch of the imagination, Sofrito Xanadu LLC was the first user of the mark, it stopped using the mark by April of 2009.  By Defendant Mangan's own admission, Sofrito Xanadu LLC ceased using the mark when the bankruptcy trustee shut down the restaurant, and McMenamin's assets were transferred to DC Holdings. PR56, ¶¶31-39.  Mangan testified to it during depositions (OM Declr, Ex. J, at 90), and his assent to the transfer of assets

(including intellectual property) to DC Holdings is evidenced in DC Holdings' operating agreement, which he signed, and to which he testified that he signed.  PR56, ¶39.

It is also clear from the parties' respective depositions, and the McMenamin's Grill bankruptcy record, that the initial use of "Don Coqui" was fraught with difficulties in light of the McMenamin's bankruptcy proceeding, and that such use was abruptly shut down by the bankruptcy trustee.  See OM Declr, Ex. W.  It is also clear that the premises were shut down for a period of time prior to reopening in July of 2009.  PR56, ¶30.  For Jaime Rodriguez to use the July 2009 date, rather than this brief period of use in the months prior reflects an abundance of caution as to an immaterial fact, rather than fraud.

Finally, there is no evidence that it was actually Sofrito Xanadu LLC that used the Don Coqui mark while the restaurant was open during the bankruptcy proceedings.  On the contrary, the bankruptcy record reveals that Jimmy Rodriguez and an entity called "Don Coqui" were attempting to revitalize McMenamin's Grill – there is, however, no reason to believe that "Don Coqui" is synonymous with Sofrito Xanadu LLC.  As argued above, even if Sofrito Xanadu LLC had used the mark, this has absolutely no relevance here given Defendants' admission that such alleged use ceased well before the commencement of Plaintiffs' use of the mark at the New Rochelle location.

Accordingly, Defendants' claim of fraud upon the USPTO is meritless and should be dismissed in its entirety.

## <u>CONCLUSION</u>

For all the reasons stated herein, Plaintiffs respectfully request that summary judgment be granted in their favor on all counts, and that Defendants' counterclaims be dismissed in their entirety.

Dated: New York, New York
      July 28, 2016

MEDENICA LAW PLLC

By:
Olivera Medenica
3 Columbus Circle, 15th Fl.
New York, New York, 10019
Tel: (212) 785-0070
Fax: (646) 514-5302
*Attorneys for Plaintiffs*

25