UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRIVADO MARKETING GROUP LLC,
DC 115 CEDAR NR, LLC and Don Coqui
HOLDING COMPANY, LLC,

                    Plaintiffs,

        – against –

ELEFTHERIA REST CORP.,

                    Defendant.

ELEFTHERIA REST CORP. and JOHN
MANGAN,
                    Counterclaim Plaintiffs,

        – against –

PRIVADO MARKETING GROUP LLC,
DC 115 CEDAR NR, LLC and Don Coqui
HOLDING COMPANY, LLC,

                    Counterclaim Defendants.

**OPINION AND ORDER**

13 Civ. 3137 (ER)

Ramos, D.J.:

        Privado Marketing Group LLC ("Privado"), DC 115 Cedar NR, LLC ("DCNR"), and

Don Coqui Holding Company, Inc. ("DC Holdings") (collectively "Plaintiffs") bring this

trademark infringement action against Eleftheria Restaurant Corp. ("Eleftheria") and John

Mangan ("Mangan").[1]  Plaintiffs allege trademark infringement and unfair competition at

common law and under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., arising from the use of the

---

[1] Although the initial Complaint asserted claims only against Eleftheria, Mangan subsequently joined the action as a
Counterclaim Plaintiff, and Plaintiffs filed a reply to the counterclaims, introducing causes of action against Mangan
that essentially mirror those originally brought against Eleftheria.  *See* Doc. 22.  For ease of reference, Eleftheria and
Mangan will be referred to herein as "Defendants."

trademark "Don Coqui" in connection with restaurants located in the New York area.  Doc. 20.
Plaintiffs now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary
judgment on all causes of action.

For the following reasons, Plaintiffs' motion is DENIED.

## I.  BACKGROUND

The following facts are undisputed unless otherwise noted.

### A.  The Parties

This trademark infringement action involves a complex web of individuals and entities,
some of whom are parties, and many of whom claim current or former partial ownership of the
Don Coqui trademark.  Plaintiffs Privado, DCNR and DC Holdings are organized and existing
under the laws of the State of New York with a principal place of business at 115 Cedar Street,
New Rochelle, New York.  *See* Declaration of Olivera Medenica dated July 27, 2016
("Medenica Declr.") (Doc. 76), at Ex. E, ¶¶ 4–6, and Ex. F, ¶¶ 4–6.[2]  Defendant Eleftheria is a
corporation organized and existing under the laws of the State of New York with a principal
place of business at 2818 31st Street, in the Astoria section of Queens, New York.  *Id.* Ex. A, at ¶
11, and Ex. B, at ¶11.  Eleftheria owns and operates a restaurant named Don Coqui located at this
address in Astoria, Queens.  *Id.*  Counterclaim Plaintiff Mangan is a principal of Eleftheria.  *Id.*

### B.  Additional Relevant Individuals

Non-party Jaime "Jimmy" Rodriguez ("Rodriguez") is a restaurateur who owned and
operated restaurants in New York City including Jimmy's Bronx Café, Jimmy's Uptown,
Jimmy's Downtown, and Sofrito.  Declaration of Jaime "Jimmy" Rodriguez ("Rodriguez

---

[2] DCNR and DC Holdings owned and operated a restaurant named "Don Coqui" located at 115 Cedar Street.  The
restaurant no longer exists, as Rodriguez changed the name of the restaurant from Don Coqui to Get Soul.
Deposition of Jimmy Rodriguez ("Jimmy Rodriguez Dep.") (Doc. 76-12) at 84–85.

Declr.") (Doc. 79) ¶ 2. Rodriguez's daughters are Jaleene and Jewelle Rodriguez. Plaintiffs' Rule 56 Statement of Material Facts ("Pls.' Rule 56.1") (Doc. 80) ¶ 10. Non-party Dimitrios Mitsios ("Mitsios") is also a principal and owner of Defendant and Counterclaim Plaintiff Eleftheria. *See* Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Mem. L. Opp.") (Doc. 85) at 3 n.1.

### C. Sofrito Xanadu LLC and the Inception of the "Don Coqui" Name

In March of 2008, Rodriguez owned and operated a restaurant called "Sofrito" in Manhattan. Pls.' Rule 56.1 ¶ 15. Rodriguez was interested in expanding to another location, and together with Mangan, Mitsios, and his daughter Jewelle, was contemplating opening a Sofrito restaurant in the Meadowlands Xanadu, a shopping complex yet to be built at the Meadowlands, New Jersey. *Id.* ¶ 16.

In furtherance of that effort, in March of 2008, Mangan, Mitsios, and Jewelle formed a New Jersey limited liability company named Sofrito Xanadu LLC ("Sofrito Xanadu"). *Id.* ¶ 12. Jewelle owns a minority interest of Sofrito Xanadu, while Mangan and Mistios, collectively, own a majority interest. Defendants' Separate Rule 56 Statement of Material Facts ("Defs.' Rule 56.1") (Doc. 85-2) ¶ 8.[3] Mangan was listed as the agent for Sofrito Xanadu, and personally invested at least $110,000 of his own funds to capitalize it. *Id.* ¶ 9. Rodriguez was also involved in the business and operations of Sofrito Xanadu. Pls.' Rule 56.1 ¶ 13.

---

[3] Defendants filed a Separate Rule 56 Statement of Material Facts (*see* Doc. 85-2) in addition to their Response to Plaintiffs' Rule 56.1 Statement of Material Facts (Doc. 85-1). However, Plaintiffs did not file with its reply brief any response to Defendants' Separate Rule 56.1 Statement, so the Court determines without argument from Plaintiffs whether any facts alleged in the Separate Rule 56 Statement are inadmissible or not based on supporting evidence in the record. *See Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence.").

On March 18, 2008, Jewelle, on behalf of Sofrito Xanadu, executed a commercial lease to open the restaurant at the Meadowlands Xanadu ("Xanadu Lease").  *Id.* ¶ 17; *see also* Declaration of Jewelle Rodriguez ("Jewelle Rodriguez Declr.") (Doc. 78) Ex. A, at P00095. Rodriguez, Mangan, and Mitrios were the guarantors on the lease.  *Id.* at P00019; *see also* Rodriguez Declr. ¶ 6.  Subsequent to the execution of the Xanadu Lease, Rodriguez sold the Manhattan Sofrito restaurant, as well as his rights to use the name "Sofrito."  Pls.' Rule 56.1 ¶ 18.  As a result, the name could not be used in connection with the proposed Xanadu restaurant. *Id.*

Afterwards, Rodriguez, Mangan, and members of Mangan's staff at his marketing company, CIN Productions, spent several weeks choosing a new name for the Xanadu restaurant. Defs.' Rule 56.1 ¶ 11.  The parties collectively determined to use the name "Don Coqui."  *Id.* [4] In September 2008, Mangan, through CIN Productions, registered various "Don Coqui" domain names, including doncoqui.com.  *Id.* ¶ 11; *see also* Declaration of John Mangan ("Mangan Declr.") (Doc. 87) Ex. B.  Also in September 2008, Rodriguez and Mangan, as guarantors under the Xanadu Lease, executed a First Amendment of Lease agreement stating that the name "Sofrito" would be replaced by "Don Coqui."  Rodriguez Declr. Ex. C ("Amended Xanadu Lease") [5] ¶ 7; *see also* Pls.' Rule 56.1 ¶ 19.  The Meadowlands Xanadu project never came to fruition, and as a result, Don Coqui was never opened there.  Pls.' Rule 56.1 ¶ 20.

---

[4] Defendants do not provide an exact time frame for when these discussions occurred, although they state—and Plaintiffs do not attempt to refute—that these discussions happened a short time *before* Rodriguez filed an application with the United States Patent and Trademark Office to register the Don Coqui name.  *See* Defs.' Rule 56.1 ¶¶ 11–13.

[5] Mitsios was not listed as a guarantor on the Amended Xanadu Lease.

**D.  Rodriguez's "Intent-to-Use" Trademark Application**

On May 9, 2008, Rodriguez filed an "Intent-to-Use" trademark application with the United States Patent and Trademark Office ("USPTO") for the Don Coqui mark in his own name (Registration No. 3,764,084) (the "Don Coqui Mark").  *Id.* ¶ 21; Doc 79-1 (the "Intent-to-Use Application").  Rodriguez did not discuss that he would be registering the Don Coqui Mark in his own name with Mangan.  Defs.' Rule 56.1 ¶ 14.

**E.  The New Rochelle Don Coqui Restaurant, DC Holdings and DCNR**

After the Xanadu Lease fell through, Rodriguez approached MacMenamin's Grill in New Rochelle, New York, about taking over the location to open a "Don Coqui" restaurant there.  Pls.' Rule 56.1 ¶ 23.  At the time, MacMenamin's Grill was in bankruptcy proceedings.  *Id.* ¶ 24.  MacMenamin's was converted to conform with the "Don Coqui" branding, and the restaurant opened as the New Rochelle Don Coqui in late January or early February 2009.  Eleftheria Restaurant Corp.'s and John Mangan's Response to Plaintiffs' Rule 56.1 Statement ("Defs.' Rule 56.1 Resp.") (Doc. 85-1) ¶ 26.  News articles and other publically available information confirm the use of the name "Don Coqui" at the former MacMenamin's prior to March of 2009.  Defs.' Rule 56.1 ¶ 26.  Both Rodriguez and Mangan were involved in the opening of the Don Coqui restaurant in New Rochelle.  Pls.' Rule 56.1 ¶¶ 25, 27.

When Don Coqui initially opened, the MacMenamin's bankruptcy proceeding was still ongoing.  Thus, Don Coqui opened under the prior restaurant's existing lease and liquor license, and its owner Brian MacMenamin continued to work at the restaurant.  *Id.* ¶ 28; Defs.' Rule 56.1 ¶¶ 27–28.  Shortly after its opening, however, in March of 2009, the bankruptcy trustee shut down the Don Coqui restaurant pending completion of the bankruptcy proceeding.  Pls.' Rule 56.1 ¶ 30.

5

After the trustee closed the restaurant, on April 8, 2009, DC Holdings and DCNR were formed as New York limited liability companies. *Id.* ¶ 31. DC Holdings is the sole member of DCNR. *Id.* ¶ 4. The purpose of DC Holdings and DCNR was to own and operate Don Coqui restaurants, including the New Rochelle location. Defs.' Rule 56.1 Resp. ¶ 32. Money from the account of Sofrito Xanadu, including the funds that Mangan personally contributed, were transferred to the accounts of DC Holdings and DCNR. *Id.* ¶ 24.

In approximately July 2009, Don Coqui in New Rochelle re-opened. Pls.' Rule 56.1 ¶ 35. When it re-opened, the equity owners of DC Holdings were real estate developer Larry Siegal (40%), attorney Joseph Calascibetta (10%), Jaleene Rodriguez (20%), Jewelle Rodriguez (20%) and Mangan (10%). *Id.* ¶ 37; Defs.' Rule 56.1 ¶ 33. Mangan maintained an office at the restaurant, and was himself responsible for all marketing for the New Rochelle Don Coqui. Defs.' Rule 56.1 ¶ 37. This included all signage, branding, usage and development, staff apparel, advertising, and promotions. *Id.* Rodriguez executed the DC Holdings Operating Agreement on October 1, 2009 as an "employee"—as opposed to an equity owner. Rodriguez Declr., Exh. F at 15. [6] Under the Operating Agreement, DC Holdings was controlled by a Management Committee, which was comprised of Siegel, Calascibetta, and Rodriguez –who was designated as the representative of the interests of Mangan, Jewelle, and Jaleene. *Id.* ¶ 3. The DC Holdings operating agreement refers to the Don Coqui Mark as a registered trademark. Pls.' Rule 56.1 ¶ 41. The parties agree, however, that the reference to the Mark as a registered trademark is incorrect. [7]

---

[6] The Operating Agreement was effective retroactively from April 4, 2009. *Id.*

[7] Defendants note that the reference in the Operating Agreement to the Don Coqui Mark as a registered trademark is incorrect because Rodriguez did not file his Statement of Use until December 2009 and was not issued the Registration until March 2010. *See* Defs.' Rule 56.1 Resp. ¶ 41. The DC Holdings Operating Agreement also provides that all intellectual property, including trademarks related to the operation of Don Coqui restaurants owned

**F.  Statement of Use in Connection with the Don Coqui Mark**

On December 23, 2009, Rodriguez filed a Statement of Use in connection with the Don Coqui Mark Application, alleging that the date of first use of the mark was July 3, 2009.[8] Pls.' Rule 56.1 ¶ 42; Doc. 76-15 ("Statement of Use").  The USPTO subsequently issued the Don Coqui Mark registration on March 23, 2010.  *Id.* ¶ 43.

**G.  Privado Marketing Group LLC and the Purported Assignment of the Don Coqui Mark**

On April 16, 2010, Jewelle and Jaleene Rodriguez executed an operating agreement for Privado, with each owning a 50% membership interest in Privado.  *Id.* ¶ 44.  Approximately one year later, on April 6, 2011, Rodriguez executed and recorded documents that purported to assign the entire interest and goodwill in the Don Coqui Mark to Privado, and recorded the assignment with the USPTO.  *Id.* ¶ 45; Rodriguez Declr., Ex. L ("Trademark Assignment").  The parties dispute whether Rodriguez owned any interest in the Don Coqui Mark as of this date, and therefore whether this purported assignment transferred any interest to Privado.  *See* Defs.' Rule 56.1 ¶ 49.

---

or developed by any member of DC Holdings or by Rodriguez, "shall be owned" by DC Holdings.  Jimmy Rodriguez Declr. Ex. F ("DC Holdings Agreement") ¶ 9.  However, Rodriguez has testified that the transfer of interest in the trademark to DC Holdings never took place, and that the recitation of ownership in the Operating Agreement is inaccurate.  Jimmy Rodriguez Dep. at 76:3–13 ("Q. Was there a time that Don Coqui Holding Company owned the trademark?  A. Never.  Q. So when it says "All intellectual property shall be owned by the company," this is -- A. It never was transferred, and it was never owned by the holding company.  Q. Okay. What's the purpose of this paragraph? A. I don't know.").

[8] Presumably, this date refers to the date the New Rochelle Don Coqui re-opened after the bankruptcy trustee shut it down.  *See* Pls.' Mem. L. at 24 ("It is also clear that the premises were shut down for a period of time prior to reopening in July of 2009.  For [] Rodriguez to use the July 2009 date, rather than this brief period of use in the months prior reflects an abundance of caution…") (internal citation omitted).

**H. Jaleene and Jewelle Rodriguez Purportedly Acquire DC Holdings**

On April 30, 2011 Joseph Calascibetta and Laurence Siegel entered into an agreement to sell their membership interest in DC Holdings to Jaleene and Jewelle.  Pls.' Rule 56.1 ¶ 46.  On July 26, 2011 Mangan entered into an agreement with Jaleene and Jewelle, under which Mangan purported to sell his 10% membership interest in DC Holdings to them in exchange for $100,000 ("Mangan Share Agreement").  Defs.' Rule 56.1 ¶ 50.  Jaleene and Jewelle executed promissory notes in favor of Mangan, each promising to pay him $50,000 in regular installment payments. *Id.*  Neither Jaleene nor Jewelle have made any payments to Mangan, however.  *Id.*  Plaintiffs claim that as a result of these transfers, Jaleene and Jewelle Rodriguez each became a 50% owner in DC Holdings, *see* Pls.' Rule 56.1 ¶ 47, but Defendants maintain that Mangan still owns his 10% share because he has not received any consideration for sale of his membership interest. Defs.' Rule 56.1 Resp. ¶ 47.

**I. Eleftheria Restaurant Corp. and the Astoria Don Coqui Restaurant**

Eleftheria is a corporation organized and existing under the laws of the State of New York with a principal place of business at 2818 31st Street, Queens, New York. *Id.* ¶ 5.  Mitsios and Mangan are principals of Eleftheria.  Pls.' Rule 56.1 ¶¶ 7–8.  In 2008, as they were planning the New Rochelle Don Coqui, Jimmy, Jaleene and Jewelle Rodriguez and Mangan planned with Mitsios to simultaneously convert Mitsios' then-existing "Zodiac" Greek restaurant in Astoria into a second Don Coqui restaurant.  Defs.' Rule 56.1 ¶¶ 19, 53, 54.  As a part of the conversion, Mangan invested $50,000 in Eleftheria.  *Id.* ¶ 55.  Eleftheria incurred substantial sums in connection with the work necessary for the conversion, including filings with the Secretary of State and State Liquor Authority, and changing the signage and physical structure of the restaurant to conform with the design of the New Rochelle Don Coqui.  *Id.* ¶ 56.

8

There has never been any written license agreement relating to the use of the Don Coqui Mark at the Astoria location. Pls.' Rule 56.1 ¶ 49. In October of 2011, the Don Coqui Astoria location opened. *Id.* ¶ 52. Both Rodriguez and Jaleene were on Eleftheria's payroll. *Id.* ¶ 55. Defendant Eleftheria made some payments to Privado, but the parties dispute the purpose of the payments and, specifically, whether they were licensing royalty payments for the use of the Don Coqui Mark. *Id.* ¶ 54; Defs.' Rule 56.1 Resp. ¶ 54. Eleftheria's business records indicate that these payments were for "marketing services." *See* Medenica Declr. at Ex. S.

### J. Cease and Desist Letter Regarding the Don Coqui Mark

The relationship between the Rodriguez Family on the one hand, and Mangan and Mitsios on the other, deteriorated shortly after opening the Astoria location. Rodriguez Declr. ¶ 28. On February 5, 2013, Plaintiffs sent Defendant Eleftheria a cease and desist letter demanding that Defendants cease using the Don Coqui Mark. Pls.' Rule 56.1 ¶ 56. Eleftheria refused to discontinue its use of the Mark and has continued its use of the Mark since the restaurant's opening. *Id.* ¶¶ 57–58. After communicating by telephone and email with representatives and counsel for Defendant, Plaintiffs sent a second cease and desist letter on March 22, 2013. *Id.* ¶ 59.

## II. PROCEDURAL HISTORY

Plaintiffs brought suit with Eleftheria as the sole Defendant for trademark infringement and unfair competition under both the Lanham Act and common law. Complaint (Doc. 1) ¶¶ 52-79. Eleftheria, joined by Mangan as a Counterclaim Plaintiff, responded by filing an Amended Answer asserting counterclaims for (1) cancellation of Plaintiff's registration of the Mark, along with a declaration of the registration's invalidity and unenforceability ("Counterclaim One"), and (2) a declaration that Defendants own and/or have the right to continue using the Mark

("Counterclaim Two").  Doc. 21.  Plaintiffs filed their answer to the counterclaims two weeks later, asserting claims against Mangan that essentially mirrored those originally brought against Eleftheria.  Doc. 22.  Plaintiffs moved to dismiss the counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Court granted the motion to dismiss without prejudice.  Doc. 30.  On July 28, 2014, Defendants filed their Second Amended Counterclaims asserting nine counterclaims:

- Cancellation of the trademark registration based on non-ownership (Count I);

- Cancellation of the trademark registration based on fraud due to separate factual allegations of alleged fraud (Counts II-V);

- Fraudulent registration in violation of the Lanham Act (Count VI);

- Cancellation of the trademark registration based on lack of priority of use (Count VII);

- Cancellation of the trademark registration due to abandonment (Count VIII); and

- Declaration of ownership and/or right to use for Mangan, Mitsios and/or Eleftheria (Count IX).

Doc. 31.  Plaintiffs now seek summary judgment on their claims and counterclaims, and request that the Court permanently enjoin Defendants from using the Don Coqui Mark.  *See* Notice of Plaintiffs' Motion for Summary Judgment ("Motion") (Doc. 73); Brief in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Mem. L.") (Doc. 74) at 24.[9]

---

[9] The Court notes, however, that Plaintiffs' memorandum of law—although purportedly seeking summary judgment on *all* claims and counterclaims—does not specifically and separately address all of Defendants' counterclaims.  For clarity, the Court notes that although Defendants brought several separate counterclaims based on cancellation of the trademark registration due to fraud, both parties addressed these claims collectively under the umbrella of fraud against the USPTO.  Additionally, the parties address the counterclaims for cancellation of the trademark based on lack of priority use, non-ownership, and abandonment, as well as the counterclaim for declaration of ownership for Mangan, Mitsios, and/or Eleftheria within their arguments for Plaintiffs' trademark infringement and unfair competition claims, although they were plead as separate counterclaims.  All of these overlapping analyses require a determination of the ownership of the Mark, the first or continuous user of the Mark, and whether its use was abandoned.  Thus, the analysis of Plaintiffs' motion for summary judgment on their claims will necessarily be dispositive of their motion for summary judgment on Defendants' counterclaims.

## III.  LEGAL STANDARD

Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322–23); *see also* Fed. R. Civ. P. 56(c)(1)(B).  The burden then shifts to the non-moving party to come forward with admissible evidence sufficient to support each essential element of the claim, and "designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted); *see also Cordiano*, 575 F.3d at 204.

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). A motion for summary judgment cannot be defeated on the basis of conclusory assertions, mere denials, or unsupported alternative explanations of facts. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *see also Senno*, 812 F. Supp. 2d at 467 (citing *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998)). "The nonmoving party cannot defeat summary judgment by 'simply showing that there is some metaphysical doubt as to the material facts,'" *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)), it "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson*, 477 U.S. at 256–57).

"Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp.,* 477 U.S. at 322). In that situation, there can be no genuine dispute as to any material fact, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23.

## IV.  DISCUSSION

Plaintiffs assert trademark infringement under both the Lanham Act, 15 U.S.C. § 1114 (Count I), and common law (Count III), as well as unfair competition under both the Lanham Act, 15 U.S.C. § 1125(a) (Count II),[10] and common law (Count IV).  Plaintiffs move for summary judgment arguing that the Don Coqui Mark is a valid trademark duly registered by Rodriguez and assigned by him to Privado, and that Defendants' continued use of the Mark is unauthorized and is likely to cause consumer confusion.  "Courts employ substantially similar standards" when analyzing claims for trademark infringement under the Lanham Act, trademark infringement under New York common law, and unfair competition under New York common law. *Van Praagh*, 993 F. Supp. 2d 293 at 301; *see also Richemont N. Am., Inc. v. Huang*, 12 CIV. 4443 (KBF), 2013 WL 5345814 at *5 n. 15 (S.D.N.Y. Sept. 24, 2013) ("[U]nfair competition under Section 43(a) of the Lanham Act…requires an identical test to that for infringement."); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) (under New York law, "the elements necessary to prevail on causes of action for trademark infringement and unfair competition . . . mirror the Lanham Act claims") (internal quotation marks and citation omitted).  In this regard, to prevail in an infringement action, a plaintiff must demonstrate:  (1) "that it has a valid mark entitled to protection" and (2) "that the defendant's use of that mark is likely to cause confusion." *Juicy Couture v. Bella Intern. Ltd.*, 930 F. Supp. 2d 489, 498 (S.D.N.Y. 2013) (quoting *Time, Inc. v. Petersen Publ'g Co. LLC*, 173

---

[10] While the parties and many courts refer to a claim arising under 15 U.S.C. § 1125 as "unfair competition," this term is used interchangeably with the term "false designation of origin."  *See Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014) ("As to a federal claim of false designation of origin, which is also referred to as a claim for unfair competition…").

F.3d 113, 117 (2d Cir. 1999)).[11]  Defendants argue that Plaintiffs have not established either of these elements.

### A.  Ownership of the Trademark

The Parties dispute what person or entity owns the Don Coqui Mark.  Plaintiffs maintain that Rodriguez registered the Mark and later assigned it to Privado.  Defendants argue that Plaintiffs have failed to sufficiently establish that Rodriguez had rights to the Mark, and that the evidentiary record also supports different theories of use and ownership of the Don Coqui Mark, which, if proven at trial, would preclude Privado's current ownership.

The Lanham Act provides that registration of a trademark "shall be admissible in evidence and shall be *prima facie* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce . . . ."  15 U.S.C. § 1115(a); *see also Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) (citing 15 U.S.C. § 1115(a)) ("A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (i.e., protectable), that the registrant owns the mark, and that the registrant

---

[11] In addition, Plaintiffs' common law claim for trademark infringement, to the extent it seeks money damages, requires proof that (i) consumers were actually confused by Defendants' use of the Don Coqui Mark (beyond a mere likelihood of confusion), or (ii) that Defendants showed bad faith in any unauthorized use of the mark.  "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *KatiRoll Co. v. Kati Junction, Inc*., 33 F. Supp. 3d 359, 368 (S.D.N.Y. 2014) (quoting *Star Indus., Inc. v. Bacardi & Co*., 412 F.3d 373, 388 (2d Cir. 2005)); *see also Louis Vuitton Malletier, S.A. v. Hyundai Motor Am*., No. 10 Civ. 1611 (PKC), 2012 WL 1022247, at *20 (S.D.N.Y. Mar. 22, 2012) ("The elements of a federal trademark-infringement claim and a New York unfair competition claim are almost indistinguishable, except that New York requires an additional element of bad faith" and proof of actual confusion if money damages are sought.") (citation and internal quotation marks omitted); *Advance Magazine Publishers, Inc. v. Norris*, 627 F. Supp. 2d 103, 112 (S.D.N.Y. 2008) ("The elements of Defendants' common law claims for trademark infringement and unfair competition are similar to their federal claims, except that New York unfair competition law also requires a showing of actual confusion and bad faith before monetary relief maybe awarded.") (internal quotation marks and citation omitted).

has the exclusive right to use the mark in commerce."). As such, when a plaintiff sues for infringement of a registered mark, the defendant bears the burden of production and persuasion to rebut the presumption of ownership. *See Rick v. Buchansky*, 609 F. Supp. 1522, 1531 (S.D.N.Y. 1985) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14 (2d Cir. 1976)).[12] However, trademark ownership rights go to the "first-to-use, not [the] first-to-register." *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 105–06 (E.D.N.Y. 2012) (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 16:18 (4th ed. 2010)).

Defendants proffer several arguments in opposition. First, Defendants aver that a genuine issue of fact exists regarding whether Rodriguez committed fraud on the Trademark Office, and therefore whether Privado's registration should be canceled. Defs.' Mem. L. Opp. at 14–16. Second, Defendants argue that the even if the registration was not procured fraudulently, it should be canceled because Privado is not the owner of the Don Coqui Mark. Under § 2(d) of the Lanham Act, the registration can be canceled by a person or entity with prior, superior rights to the Mark. *Id.* at 17–19. Third, Defendants argue that absent evidence of a valid registration and the accompanying presumption of conclusive evidence of ownership, genuine issues of fact remain regarding the ownership of the Don Coqui Mark that preclude summary judgment. *Id.* at 19–20.[13]

---

[12] If a court finds that the registrant is not entitled to ownership of the mark, the court is empowered to order cancellation of the registration. 15 U.S.C. § 1119 ("In any action involving a registered mark the court may determine the right to registration, [and] order the cancelation of registrations, in whole or in part…").

[13] Additionally, Defendants argue that Plaintiffs' motion should be denied on the basis of equitable estoppel because Defendants relied on Plaintiffs' silence, and Defendants did not complain about the Astoria restaurant for two years as Defendants invested money into promoting the Don Coqui brand there. *See* Defs.' Mem. L. Opp. at 26–27. Although Plaintiffs do not address this argument in their reply memorandum, the Court need not determine this issue because it denies summary judgment on other grounds.

### i. Cancellation of the Trademark Due to Fraud

Although it is undisputed that Rodriguez registered the Don Coqui Mark with the USPTO, Defendants contend that the registration was fraudulently obtained and that the trademark should be cancelled. The principles applicable to such a claim are well settled:

> Generally, a party alleging that a registration was fraudulently obtained must prove the following elements by clear and convincing evidence: 1. A false representation regarding a material fact [;] 2. The person making the representation knew or should have known that the representation was false ("scienter") [;] 3. An intention to induce the listener to act or refrain from acting in reliance on the misrepresentation [;] 4. Reasonable reliance on the misrepresentation [; and] 5. Damage proximately resulting from such reliance.

*Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 270–271 (2d Cir. 2011) (citations omitted); *see also MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 659 (2d Cir. 2016) (reaffirming holding in *Patsy's Italian Restaurant*, 658 F.3d 254). Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with his application. *Tarntino*, 826 F.3d at 658 (citing *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009)) (quotation marks omitted).

Since direct evidence of deceptive intent is rarely available, subjective intent to deceive can be inferred from indirect and circumstantial evidence. *MPC Franchise, LLC v. Tarntino*, 19 F. Supp. 3d 456, 478 (W.D.N.Y. 2014), *aff'd*, 826 F.3d 653 (2d Cir. 2016) (quoting *Haggar Intern. Corp.*, 906 F. Supp. 2d at 107–08). "The alleged fraudulent misstatements must be more than an error or inadvertence, and instead must show a deliberate attempt to mislead the USPTO" because "fraud on the USPTO implies some intentional deceitful practice or act designed to obtain something." *Haggar Intern. Corp.*, 906 F. Supp. 2d at 107; *see also Tarntino*, 826 F.3d at 659 (noting that "mere negligence is not sufficient to infer fraud" and "to succeed on a claim that

a trademark holder procured the mark by fraud, a plaintiff cannot merely show that the trademark holder 'should have known' that the application contained false statements of material fact").

Defendants argue that the first use of the mark was in late January or early February, 2009, and therefore Rodriguez knew that his statement that he had personally first made use of the Don Coqui Mark on July 3, 2009 was false.  In addition, Defendants allege Rodriguez did not have a "bona fide intent to use" the trademark himself.  *See* Defs.' Mem. L. Opp. at 15–16. Plaintiffs aver that Defendants have failed to show by "clear evidence" that Rodriguez had a willful intent to deceive and that Defendants' purported damages are proximately caused by the Don Coqui Mark Registration.  Reply Brief in Further Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Reply Mem.") (Doc. 90) at 3–5.[14]  However, Plaintiffs misconstrue Defendants' burden of proof as the non-moving party at the summary judgment stage.  Where a moving party does not bear the ultimate burden of proof on an issue—as here—that party

---

[14] Plaintiffs also claim that Defendants waited too long to assert the fraud claim and that they should have held a cancellation proceeding earlier instead of asserting the claim as a counterclaim in the instant action.  *See* Pls.' Reply Mem. at 6.  Defendants cite one case from 1967 for this proposition.  *Id.*  However, parties routinely present fraud arguments as defenses or counterclaims.  *See, e.g.*, *Haggar Int'l Corp.*, 906 F. Supp. 2d at 101 (noting Defendants filed counterclaims for trademark cancellation); *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 241 (E.D.N.Y. 2009) ("The right for a party to counterclaim for cancellation of a trademark is set forth by 15 U.S.C. § 1119, which provides:  In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, and otherwise rectify the register with respect to the registrations of any party to the action.  Decrees and orders shall be certified by the court to the Director [of the PTO], who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby."); *see also Victorinox AG v. B & F Sys., Inc.*, 114 F. Supp. 3d 132, 138 n.5 (S.D.N.Y. 2015) ("It bears noting that defendants did not plead a counterclaim for cancellation based on fraud…. Nonetheless, the counterclaims did allege the same facts that defendants now contend prove their fraud theory, and therefore gave plaintiffs sufficient notice of defendants' claims.").

Furthermore, the Court does not find compelling Plaintiffs' argument that Defendants cannot demonstrate that their purported damages proximately resulted from the Don Coqui registration.  Plaintiffs argue that Defendants cannot demonstrate that they are senior users of the mark who were harmed by the registration, and therefore have not proven proximate cause.  *See* Pls.' Reply Mem. at 6.  For the reasons discussed within, a material issue of fact remains as who has shown prior and continuous use, which necessarily effects whether Defendants can be construed as senior users.

satisfies its summary judgment burden by "point[ing] to the absence of evidence to support an essential element of the non-moving party's claim." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1986). While it is true that to prevail on their counterclaim for cancellation due to fraud, Defendants must show the elements by clear and convincing evidence, "to survive summary judgment," the party alleging fraud must only show that there is a "genuine issue" as to the elements required to prove fraud. *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1041–42 (C.D. Cal. 2011), *aff'd*, 738 F.3d 1085 (9th Cir. 2013). In short, Defendants must show only a genuine issue as to the elements of Rodriguez's alleged fraud on the USPTO and summary judgment is proper only if Plaintiffs can point to the absence of evidence supporting an essential element of the counterclaim.

Here, given Mangan's undisputed financial interest in the Sofrito Xanadu venture and his participation in creating and marketing the Don Coqui Mark, there exists an issue of material fact as to whether Rodriguez could earnestly believe his attestation that "no other person, firm, corporation, or association ha[d] the right to use the [Don Coqui] mark." *See* Intent-to-Use Application at 4. Defendants allege—and Plaintiffs have not attempted to refute—that Rodriguez, Mangan, and members of Mangan's staff together came up the name "Don Coqui" to replace the name Sofrito. Defs.' Rule 56.1 ¶ 11.[15] Rodriguez then applied for the Don Coqui Mark in his individual capacity in May 2008 and signed an oath attesting that he was the owner and that no other person or company had right to use the mark. *See* Intent-to-Use Application at 4. Rodriguez did not discuss the application with or seek approval from Mangan. Mangan

---

[15] Mangan was listed as the agent for Sofrito Xanadu, and personally invested at least $110,000 of his own funds in 2008 to capitalize it. *Id.* ¶ 9. There is no evidence in the record to suggest that Rodriguez ever owned an interest in Sofrito Xanadu, but Mangan and Mistios collectively owned a majority interest at the time they came up with the Don Coqui name. *Id.* ¶ 8.

Declr. ¶ 12.  The Amended Xanadu Lease, which was executed in September 2008, lists the name of the proposed restaurant as "Don Coqui," with both Mangan and Rodriguez as guarantors on the lease.  Amended Xanadu Lease ¶ 7.  That same month, Mangan, through his marketing company, registered various "Don Coqui" domain names, including doncoqui.com.  News articles and other publically available information also confirm the use of the name Don Coqui prior to March 2009 at the former MacMenamin's.  Months later, in December 2009, Rodriguez filed his Statement of Use, and again signed an oath attesting that he was the owner of the mark. Statement of Use at 7 ("The undersigned…believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely…").  In his Statement of Use, Rodriguez attested that he first made use of the Don Coqui Mark on July 3, 2009.  *Id.* at 1 (noting the date of "first use anywhere" and "first use in commerce" was July 3, 2009).

The Court finds the Second Circuit's decision in *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653 (2d Cir. 2016) instructive.  In *Tarntino*, the Second Circuit affirmed the district court's granting of summary judgment cancelling a trademark that was fraudulently procured.  *Id.* Defendant inherited one third of a company that owned a chain of pizza restaurants called Pudgie's.  *Id.* at 656.  Defendant filed an application with the USPTO seeking a trademark registration for the name Pudgie's, and certified in his application that to the best of his knowledge, no other person or company had the right to use the mark.  *Id.*  The Second Circuit held that the plaintiff had established the requisite degree of scienter on the part of the defendant to cancel the trademark for fraud because the defendant was well aware that he was merely a one-third owner and his attempt to register the mark for himself was not a mistake.  *Id.* at 661.

19

The Court noted there was abundant evidence that Tarntino knew that others had rights to use the mark that were at least equal, if not clearly superior, to his own because he was aware of multiple other restaurant locations using the mark and understood the origin of the mark and how it was previously used.  *Id.*[16]

Rodriguez—unlike the defendant in *Tarntino*—was not even a partial owner of Sofrito Xanadu or the New Rochelle Don Coqui.  *See Tarntino*, 19 F. Supp. 3d 456, 478–79 (W.D.N.Y. 2014), *aff'd*, 826 F.3d 653 (2d Cir. 2016) (noting that "the instant case is somewhat unique because … Tarntino's statement was not only false as to the date of first use, it was also false because it indicated that *he was the person who used the mark* in 1980, when in fact he never personally used the mark.  Rather, he was merely a one-third owner of a corporation that used the mark.") (emphasis in original).[17]  At this stage, while it is clear that July 3, 2009 was *not* the date of the first use as Rodriguez stated in his trademark application, it is unclear whether Rodriguez engaged in a purposeful or deliberate misstatement in that regard or an omission regarding another's right to use the mark.  *City of N.Y. v. Tavern on the Green, L.P.*, 427 B.R. 233, 242 (S.D.N.Y. 2010) ("The deliberate omission in a trademark application of information regarding another's right to use the mark applied for is a material omission justifying cancellation of that mark.").  Unlike *Tarntino*, the history of the early usage and ownership of the mark is not clear, and therefore Rodriguez's intent is not discernable at this stage.  Plaintiffs have thus failed to satisfy their burden for a grant of summary judgment.

---

[16] While Defendants rely on *Tarntino* for their fraud argument, Plaintiffs fail to address the case at all or distinguish it.

[17] On appeal, the Second Circuit did not address defendant's statement of first use, as it concluded on separate grounds that plaintiffs established by clear and convincing evidence that defendant fraudulently obtained his mark. *See Tarntino*, 826 F.3d at 658 n.3.

### ii.   Adoption and Use of the Don Coqui Mark

Whether the trademark should be cancelled due to fraud necessarily affects the analysis of the ownership of the Don Coqui Mark, as evidence of registration is presumptive evidence of ownership of a mark.  "Where claimants dispute the right to use a particular trademark, the general rule is that priority of appropriation and use determines which litigant will prevail in its use."  *Fusco Grp., Inc. v. Loss Consultants Int'l, Inc.*, 462 F. Supp. 2d 321, 327 (N.D.N.Y. 2006) (internal citations and quotation marks omitted); *see also Modular Cinemas of Am., Inc. v. Mini Cinemas Corp.*, 348 F. Supp. 578, 581 (S.D.N.Y. 1972) ("It is an axiomatic principle of trademark law that priority in adoption and actual use of a name or designation, as a trademark, is the essential criterion upon which ownership is based.").  "The first user who continuously uses an inherently distinctive service mark in the relevant market is the senior user and has priority over any second comers."  *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 530 (S.D.N.Y. 2012) (quoting *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1347 (E.D.N.Y. 1994)); *see also Lab. Corp. of Am. v. Schumann*, No. 3:06 Civ. 01566 (VLB), 2009 WL 275859, at *3 (D. Conn. Feb. 4, 2009) ("Trademark rights flow from priority and that priority is acquired through use.…Thus, so long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is entitled to prevent others from using the mark to describe their own goods in that market.") (quoting *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146–47 (2d Cir. 2007).

However, "the mere conception of a mark, without its subsequent use in commerce, would be insufficient" to confer trademark rights.  *Rick v. Buchansky*, 609 F. Supp. 1522, 1531 (S.D.N.Y. 1985).  The "critical issue" is who first appropriated and used the mark.  *Id*.; *see also*

*Tecnimed SRL v. Kidz-Med, Inc*., 763 F. Supp. 2d 395, 403 (S.D.N.Y. 2011), *aff'd*, 462 F. App'x

31 (2d Cir. 2012) ("[A]ctual use in connection with a particular business is the primary

consideration in establishing ownership of a trademark.") (internal quotation marks and citation

omitted).   "Nonetheless, the question of who originally conceived of a particular mark may have

some bearing upon the controlling issue of who first used the mark…." *Id.*

Plaintiffs maintain that Rodriguez demonstrated first and continuous use of the Don

Coqui Mark, and that his subsequent assignment of the trademark to Privado was a valid transfer

of all rights, so summary judgment is appropriate.  As discussed above, the evidence on the

record supports a finding that Rodriguez conceived the Don Coqui Mark *with* Mangan for use at

the proposed Xanadu location on behalf of a corporation in which Mangan, but not Rodriguez,

held an ownership interest.  The Amended Xanadu Lease cites the name of the proposed

restaurant as "Don Coqui," with both Mangan and Rodriguez as guarantors on the lease.

Amended Xanadu Lease ¶ 7.  Ultimately, the Xanadu location fell through and the first Don

Coqui restaurant opened in New Rochelle in late January or early February 2009.  Defs.' Rule

56.1 Resp. ¶¶ 23, 26.  It is undisputed that both Rodriguez and Mangan were also involved in the

opening and operation of that restaurant.  Pls.' Rule 56.1 ¶¶ 25, 27.[18]  The parties did not own the

restaurant, however, until April.[19]  The bankruptcy trustee shut down Don Coqui, which suggests

---

[18] Plaintiffs argue that even if Sofrito Xanadu was the first user of the Mark, it stopped using the Mark by April 2009 when the bankruptcy trustees shut down the restaurant and MacMenamin's assets were transferred to DC Holdings. Pls.' Mem. L. at 23.  Defendants dispute that all of MacMenamin's assets were sold to DCNR.  The Court notes that under the bill of sale, MacMenamin's sold certain "goods and chattels," to DCNR, but did not purport to transfer the interest to any trademarks or other intellectual property.  Defs.' Rule 56.1 ¶ 44; Rodriguez Declr., Ex. H.  Plaintiffs have failed to point to any documentary evidence to suggest any intellectual property owned by MacMenamin's was ever transferred to DCNR.  Additionally, it is also unclear whether the entity the parties refer to as MacMenamin's ever used or claimed ownership of the Mark—as opposed to Sofrito Xanadu.

[19] Defendants assert that Mangan, together with Rodriguez and on behalf of Sofrito Xanadu, opened the restaurant in early 2009.  Defs.' Rule 56.1 Resp. ¶ 23; Mangan Declr. ¶ 19.  However, documents from the bankruptcy proceedings indicate that the restaurant was still legally owned by Brian MacMenamin, but started operating under a

that it was still owned by MacMenamin's, and it was opened 4 months later under the ownership of DC Holdings and DCNR. Mangan was an owner of DC Holdings and responsible for all marketing for the restaurant. Defs.' Rule 56.1 ¶ 37. Rodriguez had no ownership interest in DC Holdings, though he served on the Management Committee as an employee. *See* DC Holdings Agreement ¶ 3.

Based on the above history of the creation of the Don Coqui Mark and its use, including the involvement of both Rodriguez and Mangan, genuine issues of fact remain as to who has shown priority and continuous use—and thus ownership—of the Don Coqui Mark.[20] Therefore, the resolution of this issue is reserved for the trier of fact.

## B. Whether Defendants' Use of the Mark is Likely to Cause Confusion

Plaintiffs' motion for summary judgment also fails because the Plaintiffs have not shown that the Defendants' use of the Don Coqui Mark is likely to cause confusion. Plaintiffs argue that the Astoria Don Coqui location was opened pursuant to an oral or implied license agreement, and likelihood of consumer confusion is therefore established where a former licensee continues to use a trademark without authorization. The Second Circuit has held that

---

new name in approximately February 2009. *See* Docs. 76-22; 76-23; 76-24 ("MacMenamin's Bankruptcy Documents"); *see also* Jimmy Rodriguez Dep. at 91–92 (discussing bankruptcy).

[20] Even if Rodriguez made first use of the Don Coqui Mark, the record also contains evidence suggesting alternative conclusions regarding use and ownership, which would preclude Privado from prevailing on summary judgment. For example, the DC Holdings Operating Agreement states that all trademarks related to Don Coqui restaurants "owned or developed by" Rodriguez or its members "shall be owned by" DC Holdings, *see* DC Holdings Agreement ¶ 9, but Rodriguez testified that he never assigned his rights to the Don Coqui Mark to DC Holdings. Jimmy Rodriguez Dep. at 76:3–13. Therefore, an unresolved issue remains as to whether Rodriguez's assignment of the Don Coqui Mark to Privado was void *ab initio* if he no longer held ownership rights. The record also reflects an unresolved dispute as to whether Jaleene and Jewelle's contract with Mangan for his ownership interest in DC Holdings is valid and enforceable in light of allegations that they have never paid him the amount they agreed for his ownership interest.

where an entity continues to use a trademark after a license to do so expires, the probability of

consumer confusion is increased:

> A licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder.  When such party…loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer.  Consumers have already associated some significant source identification with the licensor.  In this way the use of a mark by a former licensee confuses and defrauds the public.

*Church of Scientology International v. Elmira Mission of the Church of Scientology*, 794 F.2d

38, 44 (2nd Cir. 1986) (finding likelihood of consumer confusion where local branch of

international religious organization continued to operate after its license was terminated); *see*

*also Ryan v. Volpone Stamp Co.,* 107 F. Supp. 2d 369, 381 (S.D.N.Y. 2000) (citing *Church of*

*Scientology International*, 794 F.2d at 44).  In such situations, "confusion is almost inevitable

because consumers have already associated the formerly licensed infringer with the trademark

owner" and a likelihood of confusion is established as a matter of law.  *L & L Wings, Inc. v.*

*Marco-Destin, Inc*., 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009).  The ultimate question as to

likelihood of confusion is a question of law for the Court.  *Gameologist Grp., LLC v. Sci. Games*

*Int'l, Inc.*, 838 F. Supp. 2d 141, 156 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013).

The question of likelihood of confusion is appropriate for resolution on a motion for summary

judgment "where the undisputed evidence would lead only to one conclusion as to whether

confusion is likely." *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 478 (2d Cir. 1996).

To prove that an oral license exists, Plaintiffs must establish "all essential terms" of the

contract, such as offer, acceptance, and consideration "with sufficient definiteness that the Court

can interpret its terms."  *Oscar Prods., Inc. v. Zacharius*, 893 F. Supp. 250, 255 (S.D.N.Y. 1995).

Where an alleged contract is oral, the party alleging the contract has the "heavy burden" of

establishing objective signs of the parties' intent to be bound.  *Id.* (citation omitted).  The burden

is heavier in oral agreements because "a primary concern for courts in such disputes is to avoid

trapping parties in surprise contractual obligations that they never intended."  *Arcadian*

*Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989) (citations omitted).

Likewise, an implied license can be shown to exist by circumstantial evidence, but that evidence

must establish the elements of contract formation – including mutual assent evincing the

intention of the parties to be bound by specific contractual terms.  *Russo v. Banc of Am. Sec.*,

LLC, No. 05 CIV. 2922 (DAB), 2007 WL 1946541, at *4 (S.D.N.Y. June 28, 2007) (citing *Maas*

*v. Cornell Univ.*, 721 N.E. 2d 966, 969–70 (N.Y. 1999)).

It is undisputed that there has never been any written license agreement relating to the use

of the Don Coqui Mark at the Astoria location.  Doc. 75 at 19.  Plaintiffs argue instead that an

oral or implied license existed, pointing to the deposition testimony of Mitsios in which he states

that he discussed using the Don Coqui name with Rodriguez and that Rodriguez gave him

permission to do so.  *Id.* at 20.  Plaintiffs also point to evidence that the Rodriguez family were

on the Eleftheria payroll and that Eleftheria made payments to Privado as further evidence that

an oral or implied license existed.  *Id*. at 22.  However, Eleftheria's business records indicate that

these payments were for "marketing services," not for royalties.  *See* Medenica Declr. at Ex. S.

Defendants maintain that Eleftheria and Mangan did not operate under any oral or

implied license from Privado.  As support for their position, Defendants aver that the essential,

material terms of a trademark license, such as commencement date, term, quality control,

termination, royalties and royalty rates, were never discussed—let alone agreed to—by any of

the parties.  Defs.' Mem. L. Opp. at 12, 23.  Additionally, Mangan's declaration states that he

considered Rodriguez to be his partner in both New Rochelle and Astoria, and would never have

agreed to "license" the right to use the name Don Coqui if it could be revoked at any time. Mangan Declr. ¶ 12.  Moreover, Rodriguez himself testified that the Astoria restaurant never operated under a license agreement.  *See* Jimmy Rodriguez Dep. at 39–40 ("Q. So as far as you're concerned, [Mangan and Mitsios] never had a license or permission to use the Rodriguez trademark in Queens? A. No, they don't.").  Defendants also point to their investment in the Astoria restaurant, including the branding and marketing of the restaurant, and aver that Plaintiffs' position that they could cancel any implied or oral license at any time defies logic. That is, Defendants state they would not knowingly enter into a license agreement to use the Don Coqui Mark and develop a restaurant, signage, and branding around that name if that license could simply be revoked at will.  Defs.' Mem. L. Opp. at 23.

Viewing the evidence in the light most favorable to Defendants and drawing all reasonable inferences in their favor, the Court concludes that Plaintiffs have not met their burden of coming forward with facts that would entitle them to judgment as a matter of law because Plaintiffs have failed to establish that a license agreement existed.  The Court therefore DENIES Plaintiffs' motion for summary judgment.[21]

---

[21] Additionally, Plaintiffs' claim of unfair competition under New York state law is not amenable to summary judgment for the additional reason that Plaintiffs have not "couple[d] [their] evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendants'] bad faith;" or actual confusion.  *Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (quoting *Philip Morris USA Inc. v. Felizardo*, No. 03–cv–5891 (HB), 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004)); *see also Forschner Grp., Inc. v. Arrow Trading Co*., 124 F.3d 402, 408 (2d Cir. 1997) ("Under New York common law, the essence of unfair competition is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.") (internal quotation marks omitted).  Plaintiffs have not argued bad faith or actual confusion, and have therefore failed to establish the elements necessary for summary judgment on this claim.  *See Lopez v. Gap, Inc*., 883 F. Supp. 2d 400, 430–31 (S.D.N.Y. 2012) (dismissing state law claim as a matter of law for failure to show confusion or bad faith).

## V.  CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' Motion for Summary Judgment.

The parties are directed to appear for a status conference on **<u>Friday, April 21, at 10:00 A.M.</u>**

The Clerk of the Court is respectfully directed to terminate this motion, Doc. 73.

It is SO ORDERED.

Dated:    March 27, 2017
          New York, New York

                                              Edgardo Ramos, U.S.D.J.

27